**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **TERRY WAYNE DUCKWORTH,**      ) | |
|          ) | |
|    **Plaintiff,**          ) | |
|          ) | |
|    **v.**          ) | **CIVIL ACTION NO. 5:08-CV-223(MTT)** |
|          ) | |
| **ALLIANZ LIFE INSURANCE COMPANY**      ) | |
| **OF AMERICA,** *et al.,*          ) | |
|          ) | |
|    **Defendants.**          ) | |
|          ) | |

## <u>ORDER</u>

This matter came before the Court on September 30, 2011, for nonjury trial.

After hearing the evidence, the Court announced from the bench its Findings of Fact

and Conclusions of Law.  The Court's oral ruling did not include precise benefit

calculations.  Rather, the Court's ruling provided the Parties with sufficient guidance to

perform those calculations.  The Parties have done that and have submitted a proposed

Order, which includes the Court's oral ruling.  With several exceptions, the Findings of

Fact and Conclusions of Law that follow are essentially a transcript of the Court's ruling

from the bench.  The benefit calculations beginning at page 9 and continuing through

page 10 are the Parties' calculations based upon the Court's ruling.  The Court has

reviewed these calculations and concluded that they are consistent with the Court's

ruling.  Substantive changes made by the Court are noted.  Accordingly, the Court

enters this Order memorializing its Findings of Fact and Conclusions of Law.

**FINDINGS OF FACT**

1)  Effective October 1, 1992, Allianz issued to the Southeastern Pennsylvania Transportation Authority ("SEPTA") Policy No. LTD 2500 ("the policy"), a group long-term disability insurance policy, for the benefit of certain full-time employees of SEPTA. (CL1693-1721)

2)     As an eligible employee of SEPTA, the Plaintiff was insured under the policy, and was issued a Certificate of Coverage as evidence of his coverage under the policy.  (CL0281-0302)

3)     North American Benefits Company (NABCO) administered the policy on behalf of Allianz. (CL0196-0197)

4)     The monthly long-term disability ("LTD") benefit under the policy is equal to 60 percent of the insured's "Basic Monthly Earnings," minus "Other Income Benefits" the insured receives.  (CL1704)

5)     The policy defines "Basic Monthly Earnings" as "the insured's monthly rate of earnings from the employer in effect immediately prior to the date disability begins…" (CL1696)

6)     In relevant part, the policy defines "other income benefits" as follows:

"Other income benefits" means those benefits shown below:

5. The amount of disability or retirement benefits under the United States
   Social Security Act, The Canada Pension Plan, The Quebec Pension
   Plan, or any similar plan or act, as follows:
   a.  disability or unreduced retirement benefits for which:
    i. you are eligible; and
   ii. your spouse, child or children are eligible because of your
         disability; or
   iii. your spouse, child or children are eligible because of your
        eligibility for unreduced retirement benefits; or

      b.  reduced retirement benefits received by:
       i. you; and
       ii. your spouse, child or children because of your receipt of the
      reduced retirement benefit." (CL1705)

7)      The policy also provides a "Cost of Living Freeze," which states that "[a]fter the first deduction for each of the other income benefits, the monthly benefit will not be further reduced due to any cost of living increases payable under these other income benefits." (CL1706)

8)      The Plaintiff became "disabled" on September 11, 1996, after which he received salary continuance and sick leave pay from SEPTA. (CL1999-2000)

9)      When his salary continuance and sick leave were exhausted on April 10, 1997, the Plaintiff became eligible for LTD benefits under the policy. (CL1999)

10)      The Plaintiff submitted a claim for LTD benefits under the policy on or about March 27, 1997.  (*Id.*)

11)      The Plaintiff's LTD claim was approved, and he remains "disabled" and "on benefit" to this date. (CL0009-11)

12)      The Plaintiff's gross monthly LTD benefit was calculated based on an annual salary provided by SEPTA of $45,708. (CL1964)  This salary figure yielded basic monthly earnings of $3,809, resulting in a monthly benefit of $2,285.40 (60% x $3,809), less other income benefits.  (CL1955; CL1704)

13)      On March 30, 2001, the Plaintiff was determined "disabled" by the Railroad Retirement Board (RRB) and was retroactively awarded a Railroad Retirement Annuity (RRA), effective September 1, 1998. (Plaintiff's Exhibit "A")

14)      As of September 1, 1998, the Plaintiff's initial monthly Tier I benefits were $1,432 and his monthly Tier II benefits were $481.75. (Plaintiff's Exhibit "B")

15)     On May 19, 2004, the Plaintiff was retroactively awarded to September 1, 1998 amount of $2,148 under a special guaranty provision.

16)     From September 1, 1998 through July 11, 2005, the Defendant paid the Plaintiff a total of $97,762.35 in LTD benefits.

17)     As of July 11, 2005, NABCO "suspended" payment of any LTD benefits to the Plaintiff. (CL0014)

18)     On February 2, 2007, RRB made a retroactive adjustment to the Plaintiff's RRA due to SEPTA reporting additional earnings.  This resulted in an increase in the Plaintiff's Tier I benefits to $1,477 and, his child's benefit amount to $738 per month, bringing his special guaranty amount to $2,215.  The Plaintiff's Tier II benefit was not increased.

19)     The Plaintiff received the special guaranty rate until June 30, 2007 because his youngest child turned 18 years old in July 2007.

20)     The policy provides that "if LTD benefits have been over paid on any claim, it will be required that reimbursement be made to Allianz….within 60 days or Allianz….has the right to reduce future benefits until such reimbursement is received." (CL1719)

21)     All Tier I benefits received by Mr. Duckworth were categorized as Social Security equivalent benefits.

22)     Tier II benefits are similar to benefits that would be received from a private pension fund.  (The Parties did not include this Finding of Fact in their proposed order. However, the Parties stipulated to this fact, and the Court ruled that stipulation "in evidence."  (Trial Transcript, Doc. 82, at 30)).

## CONCLUSIONS OF LAW

This is an action on an insurance policy.  NABCO is not the insurer, but rather is a third-party administrator of the policy.  There is no viable claim stated against NABCO.  Thus, NABCO is dismissed.

As for the Plaintiff's waiver defense, and notwithstanding an anti-waiver provision in the policy, when there is a third-party administrator there could be conduct by that third-party administrator that could waive or effectively waive a policy provision.  However, based upon the undisputed facts before the Court, it is clear that, in this case, there was no waiver under Georgia law.  Waiver requires a voluntary relinquishment of a known right.  While NABCO might be criticized for not being more vigilant, it is clear that NABCO was relying on information provided by the Plaintiff.  The facts establish that the Plaintiff knew or should have known that NABCO was relying on that information, and that it was erroneous.  While the record does reflect that NABCO expected to receive from the Plaintiff documentation of the Plaintiff's Railroad Retirement Board award and did not, and yet never raised the issue for quite some time, that is not conduct sufficient to constitute waiver under Georgia law.  Thus, as a matter of law, the Plaintiff cannot maintain his waiver defense.

The Plaintiff's disability began in September 1996.  Given that this was prior to the "across the board" raise provided by his employer, SEPTA, in October 1996, for the purpose of calculating the Plaintiff's "basic monthly earnings," the relevant annual salary is $45,708, the Plaintiff's salary at the time of his disability.

As for the main issue, i.e., what constitutes "other income benefits" or whether all or part of the Plaintiff's Railroad Retirement benefit constitutes "other income benefits,"

the Court first must address the burden of proof on this issue.  The Court and the

Parties have been unable to find any clear guidance from the cases with regard to who

shoulders the burden of proof.  Under these circumstances, given that the issue is the

construction of this policy provision, and notwithstanding the fact that it is the Plaintiff's

burden to initially provide the information establishing that he is entitled to disability

benefits, when an insurer is relying upon a provision of its policy to reduce those

benefits, whether or not that provision is labeled an exclusion, the insurer has the

burden of proof.

The Court notes that the Defendant relies solely on subparagraph 5 of the offset

provision of the policy which addresses income or benefits that are similar to benefits

paid under the Social Security Act or other similar acts.  See Finding of Fact 6.  The

Court is unaware of any case that deals specifically with the issues in this case.

Specifically, whether an insurance company is entitled to offset Railroad Retirement

benefits pursuant to a policy provision allowing offsets for benefits paid under an Act or

plan similar to the Social Security Act when a portion of the Railroad Retirement

benefits is admittedly not similar to Social Security benefits.  The Court notes a

bankruptcy case, *In re Scholz*, 447 B.R. 887 (9th Cir. BAP 2011) which discussed

Railroad Retirement Act benefits in the context of an exclusion from monthly earnings

under a garnishment statute.  *Scholz* involved a question of statutory construction rather

than policy construction, but the relevant part of the opinion noted that, although the

Railroad Retirement Act was indeed similar to the Social Security Act, there were

significant differences.  The Court in *Scholz* cites the essential difference as the fact that

the Railroad Retirement Act provides, or can provide, Tier II benefits which are not

similar to Social Security benefits.

In this case, we have a policy drafted by an insurance company specifically for an insured that was a railroad.  Clearly, the Defendant knew, or should have known, that it was selling this policy to a railroad subject to the Railroad Retirement Act, which factors into the analysis that the Court must go through in applying the statutory rules of construction, which do not favor insurance companies for the reasons stated in various cases.[1]  The Court also notes cases discussing disability insurance policies that do specifically refer to Railroad Retirement benefits and Railroad Retirement annuity benefits, but this policy does not.

With regard to the Defendant's "all or nothing argument,"[2] that strikes the Court as a very dangerous argument for the Defendant, particularly in view of the conclusion

---

[1] The Eleventh Circuit recently summarized Georgia law on insurance policy interpretation, stating:

> Georgia law directs courts interpreting insurance policies to ascertain the intention of the parties by examining the contract as a whole.  A court must first consider the ordinary and legal meaning of the words employed in the insurance contract.…  Parties to the contract of insurance are bound by its plain and unambiguous terms.  If the terms of the contract are plain and unambiguous, the contract must be enforced as written….  Georgia law teaches that an ambiguity is duplicity, indistinctness, an uncertainty of meaning or expression.  When a term in a contract is ambiguous, Georgia courts apply the rules of contract construction to resolve the ambiguity.  Pursuant to Georgia's rules of contract construction, the construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part.  Further, ambiguities are construed against the drafter of the contract (i.e., the insurer), and in favor of the insured.  If the ambiguity remains after the court applies the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by the finder of fact.

*Alea London Ltd. v. American Home Servs., Inc.*, 638 F.3d 768, 773-74 (11th Cir. 2011) (quotation marks and internal citations omitted).

[2] The Defendant argued that the Court could reach only two conclusions, an argument which the Court called an "all or nothing argument."  Specifically, the Defendant argued that the Plaintiff's railroad retirement benefits had to be offset in their entirety or not at all.

that the Defendant has the burden of proof and that the Court must apply Georgia's

rules of construction for insurance policies.  If the Court accepted that argument then,

while in many ways the Railroad Retirement Act benefits are similar, they are not similar

in their entirety in a very significant way.  However, the Court does not accept that there

has to be an all or nothing interpretation of the policy.  Clearly, the intent of the policy

was to create an offset for benefits similar to Social Security benefits.  If the Defendant

wanted to do more than that, it should have said that in subparagraph 5.  Based upon

the evidence, Tier II benefits are not similar to Social Security benefits.  Given the policy

language and the rules of construction, to hold that an insurer could take advantage of

that provision to exclude from its benefit calculations, benefits received by the insured or

the participant that have no similarity to the Social Security Act would be an injustice.

This analysis leads the Court to conclude that Tier I benefits are offset and Tier II

benefits are not offset.

    With regard to the "family share" benefit, quite clearly the intent of the family

share benefit was to give railroad workers the equivalent of what they would get under

the Social Security Act, which buttresses the conclusion, that Tier II benefits are not

similar to Social Security.  Thus, "family share" benefits are subject to the offset.

Moreover, for the period of time that family share benefits were paid retroactively, the

Plaintiff only received the difference between his Tier II benefits and his family share

benefits.  For that period of time the only offsettable amount is that difference between

the Tier II benefits that were paid during that period and the family share benefit

because that is what he was paid in family share benefits.  That differential is based

upon a family share benefit of $716 and the Tier II benefit of $481.75.

Now, for the period going forward from that date in 2004 when the Plaintiff was awarded the "family share" benefit, the Plaintiff did not receive Tier II benefits, he only received "family share" benefits.  And for that period both Tier I and "family share" benefits are subject to the offset.

In light of these facts and conclusions, the relevant calculations are as follows: From September 1, 1998 through May 19, 2004, the Plaintiff retroactively received, SSEB Tier I Benefits in a monthly amount of $1,432 and Tier II Benefits of $481.75, excluding any COLA increases.  During that time, the Defendant could only offset Tier I. Thus, the net LTD benefit was $853.40 ($2,285.40 - $1,432), entitling the Plaintiff to 68.58 months of benefits totaling $58,526.17. On or about May 19, 2004, the Plaintiff was awarded a "family share" benefit which entitled him to an amount per month consisting of his Tier I benefit ($1,432) plus ½ his Tier I for his child ($716).  RRB retroactively paid the Plaintiff the differential of $234.25 ($716 - $481.75) as a "family share" benefit.  This retroactive family share benefit entitled the Defendant to offset an additional amount of $16,064.87 ($68.58 months x $234.25).  In light of this additional offset, the Plaintiff was only entitled to $42,461.30 ($58,526.17 - $16,064.87) in LTD benefits from September 1, 1998 through May 19, 2004.  From May 20, 2004 until February 2, 2007, the Plaintiff received $2,148 (Tier I plus ½ as family share) per month.  The Defendant was entitled to offset this entire amount which left a net monthly LTD benefit of $137.40 ($2,285.40 - $2,148).  Thus, for those 32.46 months, the Plaintiff was entitled to benefits totaling $4,460.  Therefore, as of February 2, 2007, the Plaintiff was entitled to $46,921.30.  On February 2, 2007, due to a report of additional earnings by the Plaintiff's employer, the Plaintiff's monthly Tier I benefit was retroactively

increased to $1,477 and consequently his child's ½ was retroactively increased to $738. The Plaintiff was paid the differential.  This increase entitled the Defendant to an additional offset of $67 per month ($45 in Tier I and $22 in family share) since September 1, 1998 (101.04 months x $67) for a differential total of $6,769.68.  Given this reduction, the Plaintiff was entitled to $40,151.62 from September 1, 1998 through February 2, 2007.  On June 30, 2007, in light of his child's age, the Plaintiff's "family share" benefit ceased.  Thus, from February 3, 2007 through June 30, 2007, the Plaintiff was only entitled to $70.40 ($2,285.40 - $2,215) per month, which was 4.9 months at $70.40 totaling $344.96.  Therefore, through June 30, 2007, the Plaintiff was entitled to $40,496.58.  From July 1, 2007, the Plaintiff only received Tier I benefits of $1,477 and Tier II benefits of $481.75, exclusive of any COLA.  Thus, since July 1, 2007, the Defendant could only offset Tier I benefit of $1,477 which entitled the Plaintiff to a net LTD benefit of $808.40 per month for 52 months from July 1, 2007 through November 1, 2011, thus, the Plaintiff was entitled to another $42,036.80 in LTD benefits.  Given these figures, the Plaintiff was to be paid a total of $82,533.38 ($40,496.58 + 42,036.80) in LTD benefits from September 1, 1998 through November 1, 2011.  The Defendant paid the Plaintiff a total of $97,762.35 in LTD benefits.  Thus, through November 1, 2011 there is an overpayment balance of $15,228.97 ($97,762.35 – 82,533.38).

Attorney's fees are not applicable under any standard based upon bad faith or other similar misconduct because there were issues here that were fair to litigate.  Thus, the Plaintiff's claim for attorney's fees is dismissed.

-11-

**SO ORDERED**, this 7th day of November, 2011.


S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT